JUDGE NATHAN

# 12 CIV 4157

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALEXIS ALEXANDER, as custodian for Chloe Sophie Alexander and ROBERT HERPST, individually, on behalf of all others similarly situated, | Civil Action No. |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | **Jury Trial Demanded** |
| - against - | |
| FACEBOOK, INC., MARK ZUCKERBERG, DAVID A. EBERSMAN, DAVID M. SPILLANE, MARC L. ANDREESSEN, ERSKINE B. BOWLES, JAMES W. BREYER, DONALD E. GRAHAM, REED HASTINGS, PETER A. THIEL, MORGAN STANLEY & CO. LLC, J.P. MORGAN SECURITIES LLC, GOLDMAN, SACHS & CO., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, BARCLAYS CAPITAL INC., | |
| Defendants. | |

RECEIVE

MAY 2 4 2012

U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiffs by their undersigned attorneys, on behalf of themselves and the class they seek to represent, allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon the investigation made by Plaintiffs' counsel, which included the review and analysis of information obtained from numerous public sources, including *inter alia*: Securities and Exchange Commission ("SEC") filings by Facebook, Inc. ("Facebook" or the "Company"), Company press releases and media reports issued by and disseminated by Facebook, and other publicly available information concerning Facebook.

## SUMMARY OF ACTION

1.    Facebook is a worldwide social networking company.   This class action is filed on behalf of all persons and/or entities who purchased or otherwise acquired Facebook common stock pursuant to and/or traceable to the Company's initial public offering (the "IPO" or the "Offering").

2.    This action arises from the materially false and/or misleading Prospectus and Registration Statement issued in connection with the IPO.   In the Offering, the Facebook offered for sale at $38.00 per share 421,233,615 shares of common stock, of which 180,000,000 shares of Class A common were offered by Facebook and 241,233,615 shares of Class A common stock were offered by existing shareholders. Based upon representations by the Company, Facebook expects to receive net proceeds of approximately $6,764,760,000 and selling shareholders expect to receive $9,066,041,719 from the IPO, after deducting underwriting discounts, commissions, and offering related transaction costs.

3.    The Prospectus and Registration Statement contained materially false and misleading statements and omitted material information in violation of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act").

## JURISDICTION AND VENUE

4.    The claims asserted herein arise under and pursuant to §§ 11, 12(a)(2), and 15 of the Securities Act.

5.    This Court has jurisdiction over this action pursuant to § 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1331.

6.      In connection with the acts and conduct alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the NASDAQ National Securities Market ("NASDAQ").

7.      Venue is properly laid in this District under § 22 of the Securities Act and 28 U.S.C. § 1391(b) and (c).  The acts and conduct complained of herein occurred in substantial part in this District and the Underwriter Defendants (as defined below) maintain their principal places of business in this District.

**PARTIES**

8.      Plaintiff Alexis Alexander, as custodian for Chloe Sophie Alexander purchased Facebook common stock, as set forth in the certification attached hereto and incorporated by reference and was damaged

9.      Plaintiff Robert Herpst purchased Facebook common stock, as set forth in the certification attached hereto and incorporated by reference and was damaged.

10.     Defendant Facebook is a Delaware corporation and maintains its principal executive offices at 1601 Willow Road, Menlo Park, California 94025.

11.     (a)      Defendant Mark Zuckerberg ("Zuckerberg") was at all relevant times, the founder of the Company and the Chairman of the Board of Directors (the "Board") and Chief Executive Officer ("CEO") of Facebook. Zuckerberg signed or authorized the signing of the Company's Registration Statement filed with the SEC.

(b)      Defendant David A. Ebersman ("Ebersman") is, and was at all relevant times, Chief Financial Officer ("CFO") of Facebook. Defendant Ebersman signed or authorized the signing of the Company's Registration Statement filed with the SEC.

3

(c)     Defendant David M. Spillane ("Spillane") is, and was at all relevant times, Chief Accounting Officer of Facebook. Defendant Spillane signed or authorized the signing of the Company's the Registration Statement filed with the SEC.

(d)     Defendant Marc L. Andreessen ("Andreessen") is, and was at all relevant times, a member of the Board of Facebook.  Defendant Andreessen signed or authorized the signing of the Company's the Registration Statement filed with the SEC.

(e)     Defendant Erskine B. Bowies ("Bowies") is, and was at all relevant times, a member of the Board of Facebook. Defendant Bowies signed or authorized the signing of the Company's the Registration Statement filed with the SEC.

(f)     Defendant James W. Breyer ("Breyer") is, and was at all relevant times, a member of the Board of Facebook. Defendant Breyer signed or authorized the signing of the Company's the Registration Statement filed with the SEC.

(g)     Defendant Donald E. Graham ("Graham") is, and was at all relevant times, a member of the Board of Facebook. Defendant Graham signed or authorized the signing of the Company's the Registration Statement filed with the SEC.

(h)     Defendant Reed Hastings ("Hastings") is, and was at all relevant times, a member of the Board of Facebook. Defendant Hastings signed or authorized the signing of the Company's the Registration Statement filed with the SEC.

(i)     Defendant Peter A. Thiel ("Thiel") is, and was at all relevant times, a member of the Board of Facebook. Defendant Thiel signed or authorized the signing of the Company's the Registration Statement filed with the SEC.

(j)     The Defendants listed above at ¶11(a)-(i) are collectively referred to herein as the "Individual Defendants."

12.     By reason of their management positions and their ability to make public statements in the name of the Company, the Individual Defendants were and are controlling persons, and had the power and influence to cause and did cause the Company to engage in the conduct complained of in this Complaint.

13.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") served as underwriter to Facebook in connection with the Offering.

14.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") served as an underwriter to Facebook in connection with the Offering.

15.     Defendant Goldman, Sachs & Co. ("Goldman Sachs") served as an underwriter to Facebook in connection with the Offering.

16.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") served as an underwriter to Facebook in connection with the Offering.

17.     Defendant Barclays Capital Inc. ("Barclays") served as an underwriter to Facebook in connection with the Offering.

18.     Morgan Stanley, J.P. Morgan, Goldman Sachs, Merrill Lynch, and Barclays served as lead underwriters of the IPO.  Morgan Stanley, J.P. Morgan, Goldman Sachs, Merrill Lynch and Barclays are collectively referred to as the "Undewriter Defendants."

## SUBSTANTIVE ALLEGATIONS

19.     On or about February 1, 2012, Facebook filed a registration statement with the SEC on Form S-1.  The Company repeatedly amended the Form S-1.  On or about May 16, 2012, the Company filed with the SEC a Form S-1/A Registration Statement (the "Registration Statement"), for the IPO.

20.     On or about May 18, 2012, the Prospectus (the "Prospectus") with respect to the IPO, which forms part of the Registration Statement, became effective and 421 million shares of Facebook common stock were sold to the public at $38 per share, thereby valuing the total size of the IPO at more than $16 billion.

21.     On May 19, 2012, Henry Blodget published an article entitled, "If This Really Happened DuringThe Facebook IPO, Buyers Should Be Mad As Hell..." The article, in relevant part, stated:

> Part way through the Facebook IPO roadshow, scattered reports appeared that Facebook had reduced the earnings guidance it was giving research analysts. This seemed bizarre on a number of levels.
>
> First, I was unaware that Facebook had ever issued any earnings guidance--to research analysts or anyone else.
>
> Earnings guidance is highly material information (meaning that any investor considering an investment decision would want to know it). It represents a future forecast made by the company. Any time any company gives any sort of forecast, stocks move--because the forecast offers a very well informed view of the future by those who have the most up-to-date information about a company's business.
>
> So if Facebook had issued any sort of guidance, even quietly, this should have been made very public by the company and its bankers--especially because millions of individual investors were thinking of buying the stock.
>
> Second, if Facebook really had "reduced guidance" mid-way through a series of meetings designed for the sole purpose of selling the stock this would have been even more highly material information.
>
> Why?
>
> Because such a late change in guidance would mean that Facebook's business was deteriorating rapidly--between the start of the roadshow and the middle of the roadshow.
>
> Any time a business outlook deteriorates that rapidly, alarm bells start going off on Wall Street, and stocks plunge.
>
> So the report that Facebook had "reduced earnings guidance" during the roadshow just seemed like a typical misunderstanding between Wall

Street and the public-something lost in translation between what a reporter was hearing from sources and what actually made it into print.

But now Reuters has just reported the same thing again. Here's a sentence from a story Reuters just published on the IPO:

Facebook also altered its guidance for research earnings last week, during the road show, a rare and disruptive move.

Hmmm.

If this really happened, anyone who placed an order for Facebook who was unaware that 1) Facebook had issued any sort of earnings guidance, and 2) reduced that guidance during the roadshow, has every right to be furious.

Because this would have been highly material information that some investors had and others didn't--the exact sort of unfair asymmetry that securities laws are designed to prevent.

This seems so obvious that I'm still very skeptical of the report. I'll now look into it. In the meantime, if anyone knows what Facebook did and didn't tell analysts, I'd be grateful for your help.

22.     On this news, shares of Facebook's stock declined $4.20 per share, a 10.99% to close on May 21, 2012, at $34.03 per share.

23.     The Registration Statement and Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation.

24.     With regard to the Company's expectations for the second quarter of 2012, the Registration Statement and Prospectus stated, in pertinent part, as follows:

Based upon our experience in the second quarter of 2012 to date, the trend we saw in the first quarter of [daily active users] increasing more rapidly than the increase in number of ads delivered has continued. We believe this trend is driven in part by increased usage of facebook on mobile devices where we have only recently begun showing an immaterial number of sponsored stories in News Feed, and in part due to certain pages having fewer ads per page as a result of product decisions.

25.     In describing the risks related to Facebook's business and industry, the Registration Statement purported to warn that the Company's revenues could be negatively affected by the rate of growth in mobile users of its site or app. The Registration Statement and Prospectus stated in pertinent part as follows:

*Growth in use of Facebook through our mobile products, where our ability to monetize is unproven, as a substitute for use on personal computers may negatively affect our revenue and financial results.*

We had 488 million [monthly active users] who used facebook mobile products in March 2012. While most of our mobile users also access Facebook through personal computers, we anticipate that the rate of growth in mobile usage will exceed the growth in usage through personal computers for the foreseeable future, in part due to our focus on developing mobile products to encourage mobile usage of Facebook. We have historically not shown ads to users accessing Facebook through mobile apps or our mobile website. In March 2012, we began to include sponsored stories in users' mobile News Feeds. However, we do not currently directly generate any meaningful revenue from the use of Facebook mobile products, and our ability to do so successfully is unproven. We believe this increased usage of Facebook on mobile devices has contributed to the recent trend of our daily active users (DAUs) increasing more rapidly than the increase in the number of ads delivered. If users increasingly access Facebook mobile products as a substitute for access through personal computers, and if we are unable to successfully implement monetization strategies for our mobile users, or if we incur excessive expenses in this effort, our financial performance and ability to grow revenue would be negatively affected.

26.     The Registration Statement and Prospectus also purported to warn investors that the Company's revenues from advertising could be adversely affected by, among other things, the "increased user access to and engagement with facebook" through mobile devices. In that regard, the Registration Statement and Prospectus stated, in pertinent part, as follows:

We generate a substantial majority of our revenue from advertising. The loss of advertisers, or reduction in spending by advertisers with Facebook, could seriously harm our business.

The substantial majority of our revenue is currently generated from third parties advertising on facebook. In 2009, 2010, and 2011 and the first quarter of 2011 and 2012, advertising accounted for 98%, 95%, 85%, 87%, and 82%, respectively, of our revenue. As is common in the industry, our advertisers typically do not have long-term advertising commitments with us. Many of our advertisers spend only a relatively small portion of their overall advertising budget with us. In addition, advertisers may view some of our products, such as sponsored stories and ads with social context, as experimental and unproven. Advertisers will not continue to do business with us, or they will reduce the prices they are willing to pay to advertise with us, if we do not deliver ads and other commercial content in an effective manner, or if they do not believe that their investment in advertising with us will generate a competitive return relative to other alternatives. Our advertising revenue could be adversely affected by a number of other factors, including:

- decreases in user engagement, including time spent on Facebook;

- increased user access to and engagement with Facebook through our mobile products, where we do not currently directly generate meaningful revenue, particularly to the extent that mobile engagement is substituted for engagement with Facebook on personal computers where we monetize usage by displaying ads and other commercial content;

- product changes or inventory management decisions we may make that reduce the size, frequency, or relative prominence of ads and other commercial content displayed on Facebook;

- our inability to improve our analytics and measurement solutions that demonstrate the value of our ads and other commercial content;

- decisions by advertisers to use our free products, such as Facebook Pages, instead of advertising on Facebook;

- loss of advertising market share to our competitors;

- adverse legal developments relating to advertising, including legislative and r regulatory developments and developments in litigation;

- adverse media reports or other negative publicity involving us, our Platform developers, or other companies in our industry;

- our inability to create new products that sustain or increase the value of our ads and other commercial content;

- the degree to which users opt out of social ads or otherwise limit the potential audience of commercial content;

- changes in the way online advertising is priced;

- the impact of new technologies that could block or obscure the display of our ads and other commercial content; and

-  the impact of macroeconomic conditions and conditions in the advertising industry in general.

The occurrence of any of these or other factors could result in a reduction in demand for our ads and other commercial content, which may reduce the prices we receive for our ads and other commercial content, or cause advertisers to stop advertising with us altogether, either of which would negatively affect our revenue and financial results.

27.     The statements referenced above in ¶¶24-26 were untrue statements of material fact. The true facts at the time of the IPO were that Facebook was then experiencing a severe and pronounced reduction in revenue growth due to an increase of users of its Facebook app or website through mobile devices rather than a traditional PC such that the Company told the Underwriter Defendants to materially lower their revenue forecasts for 2012. And, defendants failed to disclose that during the roadshow conducted in connection with the IPO, certain of the Underwriter Defendants reduced their second quarter and full year 2012 performance estimates for Facebook, which revisions were material information which was not shared with all Facebook investors, but rather, was selectively disclosed by defendants to certain preferred investors and omitted from the Registration Statement and/or Prospectus.

28.     On May 19, 2012, in an article entitled "Morgan Stanley Was A Control-Freak On Facebook IPO - And It May Have Royally Screwed Itself," Reuters reported that "Facebook. . . altered its guidance for research earnings last week, during the road show, a rare and disruptive move."

29.    On May 22, 2012, in an article entitled "Insight: Morgan Stanley cut Facebook estimates just before IPO," Reuters reported that that Facebook's lead underwriters, Morgan Stanley, JP Morgan and Goldman Sachs, all cut their earnings forecasts for the Company in the middle of the IPO roadshow and that only a handful of preferred investor clients were told the news of the reduction. In that regard, the article stated, in pertinent part, as follows:

> In the run-up to Facebook's $16 billion IPO, Morgan Stanley, the lead underwriter on the deal, unexpectedly delivered some negative news to major clients: The bank's consumer Internet analyst, Scott Devitt, was reducing his revenue forecasts for the company.
>
> The sudden caution very close to the huge initial public offering, and while an investor roadshow was underway, was a big shock to some, said two investors who were advised of the revised forecast.
>
> They say it may have contributed to the weak performance of Facebook shares, which sank on Monday - their second day of trading - to end 10 percent below the IPO price. The $38 per share IPO price valued Facebook at $104 billion.
>
> The change in Morgan Stanley's estimates came on the heels of Facebook's filing of an amended prospectus with the U.S. Securities and Exchange Commission (SEC), in which the company expressed caution about revenue growth due to a rapid shift by users to mobile devices. Mobile advertising to date is less lucrative than advertising on a desktop.
>
> "This was done during the roadshow - I've never seen that before in 10 years," said a source at a mutual fund firm who was among those called by Morgan Stanley.
>
> JPMorgan Chase and Goldman Sachs, which were also major underwriters on the IPO but had lesser roles than Morgan Stanley, also revised their estimates in response to Facebook's May 9 SEC filing, according to sources familiar with the situation.
>
> Morgan Stanley declined to comment and Devitt did not return a phone message seeking comment. JPMorgan and Goldman both declined to comment.
>
> Typically, the underwriter of an IPO wants to paint as positive a picture as possible for prospective investors. Investment bank analysts, on the other hand, are required to operate independently of the bankers and salesmen who are marketing stocks - that was stipulated in a settlement by

major banks with regulators following a scandal over tainted stock research during the dotcom boom.

The people familiar with the revised Morgan Stanley projections said Devitt cut his revenue estimate for the current second quarter significantly, and also cut his full-year 2012 revenue forecast. Devitt's precise estimates could not be immediately verified.

"That deceleration freaked a lot of people out," said one of the investors.

Scott Sweet, senior managing partner at the research firm IPO Boutique, said he was also aware of the reduced estimates.

"They definitely lowered their numbers and there was some concern about that," he said. "My biggest hedge fund client told me they lowered their numbers right around mid-roadshow."

That client, he said, still bought the issue but "flipped his IPO allocation and went short on the first day."

"VERY UNUSUAL"

Sweet said analysts at firms that are not underwriting IPOs often change forecasts at such times. However, he said it is unusual for analysts at lead underwriters to make such changes so close to the IPO.

"That would be very, very unusual for a book runner to do that," he said.

The lower revenue projection came shortly before the IPO was priced at $38 a share, the high end of an already upwardly revised projected range of $34$38, and before Facebook increased the number of shares being sold by 25 percent.

The much-anticipated IPO has performed far below expectations, with the shares barely staying above the $38 offer price on their Friday debut and then plunging on Monday.

Companies do not make their own financial forecasts prior to an IPO, and underwriters are generally barred from issuing reconmendations on the stock until 40 days after it begins trading. Analysts often rely on guidance from the company in building their forecasts, but companies doing IPOs are not permitted to give out material information that is not available to all investors.

Institutions and major clients generally enjoy quick access to investment bank research, while retail clients in many cases only get it later. It is unclear whether Morgan Stanley only told its top clients about the revised view or spread the word more broadly. The firm declined to comment when asked who was told about the research.

"It's very rare to cut forecasts in the middle of the IPO process," said an official with a hedge fund firm who received a call from Morgan Stanley about the revision.

30.    As of the date of the filing of this complaint, the 421 million shares of Facebook common stock sold in the IPO are trading at approximately $31 per share, or $7 per share below the price where plaintiff and the Class purchased $16 billion worth of Facebook stock while defendants pocketed billions of dollars. Plaintiff and the Class have suffered losses of more than $2.5 billion since the IPO.

## CLASS ACTION ALLEGATIONS

31.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of all those who purchased the common stock of Facebook pursuant and/or traceable to the Company's IPO.  Excluded from the Class are defendants herein, members of the immediate family of each of the defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any defendant has a controlling interest or which is related to or affiliated with any of the defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

32.    The members of the Class are so numerous that joinder of all members is impracticable. Facebook sold more than 421 million shares of common stock in the IPO. The precise number of Class members is unknown to Plaintiffs at this time but is believed to be in the thousands. In addition, the names and addresses of the Class members can be ascertained from the books and records of Facebook or its transfer agent or the underwriters to the IPO. Notice can be provided to such record owners by a combination of published

notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

33.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs have retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intends to prosecute this action vigorously.

34.     Plaintiffs' claims are typical of the claims of the other members of the Class because Plaintiffs and all the Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to defendants. Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

35.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged. Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

36.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

a.   whether the federal securities laws were violated by defendants' acts as alleged herein;

b.  whether the Prospectus and Registration Statement issued by defendants to the investing public in connection with the IPO negligently omitted and/or misrepresented material facts about Facebook and its business; and

c.  the extent of injuries sustained by members of the Class and the appropriate measure of damages.

## COUNT I

Violations of Section 11 of the Securities Act
Against All Defendants

37.  Plaintiffs repeat and reallege each and every allegation contained above.

38.  This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants.

39.  The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

40.  Facebook is the registrant for the IPO. The defendants named herein were responsible for the contents and dissemination of the Registration Statement and the Prospectus.

41.  As issuer of the common stock, Facebook is strictly liable to plaintiffs and the Class for the misstatements and omissions.

42.  None of the defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and the Prospectus were true and without omissions of any material facts and were not misleading.

43.     Plaintiffs acquired common stock of Facebook pursuant and/or traceable to the Registration Statement.

44.     The value of Facebook common stock has declined substantially and Plaintiffs and the Class have sustained damages as a result of defendants' violations.

45.     Less than one week has elapsed from the time that plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiffs filed this Complaint. Likewise, less than one week has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiff filed this Complaint.

## COUNT II

### Violations of Section 12(a)(2) of the Securities Act Against All Defendants

46.     Plaintiffs repeat and reallege each and every allegation set forth above.

47.     This Count is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of the Class.

48.     Defendants were sellers and offerors and/or solicitors of purchasers of the common stock offered pursuant to the Prospectus and Registration Statement.

49.     As set forth above, the Prospectus and Registration Statement contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein. Defendants' actions of solicitation included preparing the inaccurate and misleading Prospectus and participating in *efforts* to market the IPO to investors.

50.     Defendants owed to the purchasers of Facebook common stock, including Plaintiffs and the other Class members, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus and Registration Statement to

ensure that such statements were accurate and that they did not contain any misstatement or omission of material fact. Defendants, in the exercise of reasonable care, should have known that the Prospectus and Registration Statement contained misstatements and omissions of material fact.

51.     Plaintiffs and the other members of the Class purchased or otherwise acquired Facebook common stock pursuant to the Prospectus and Registration Statement, and neither Plaintiffs nor the other Class members knew, or in the exercise of reasonable diligence could have known, of the untruths, inaccuracies and omissions contained in the Prospectus and Registration Statement.

52.     Plaintiffs, individually and on behalf of the Class, hereby offer to tender to defendants those shares of common stock that Plaintiffs and the other Class members continue to own, in return for the consideration paid for those shares together with interest thereon. Class members who have sold their shares are entitled to rescissory damages.

## COUNT III

### Violations of Section 15 of the Securities
### Act Against the Individual Defendants

53.     Plaintiffs repeat and reallege each and every allegation contained above.

54.     This Count is brought pursuant to §15 of the Securities Act against the Individual Defendants.

55.     Each of the Individual Defendants was a control person of Facebook by virtue of his position as a director and/or senior officer of Facebook. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Facebook.

56.     Each of the Individual Defendants was a culpable participant in the violation of § 11 of the Securities Act alleged in Count I above, based on their having

signed the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

A.    declaring this action to be a plaintiff class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

B.    awarding plaintiffs and other members of the Class damages together with interest thereon;

C.    awarding plaintiffs and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements;

D.    awarding plaintiffs and other members of the Class rescission on their §12(a)(2) claims; and

E.    awarding plaintiffs and other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

May 24, 2012

                                        ABBEY SPANIER RODD
                                        & ABRAMS, LLP

                              By: _____
                                        Arthur N. Abbey, Esq.
                                        aabbey@abbeyspanier.com
                                        Nancy Kaboolian, Esq.
                                        nkaboolian@abbeyspanier.com
                                        212 East 39th Street
                                        New York, NY  10016
                                        Tel.:   212-889-3700
                                        Fax:   212-684-5191

## CERTIFICATION OF LEAD PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Alexis D. Alexander as Custodian for Chloe Sophie Alexander Under the North Carolina Uniform Transfers to Minor Act,   declare as follows:

1.   I have reviewed a copy of the complaint filed in this action.

2.   I did not purchase the security that is the subject of this action Facebook, Inc. (Nasdaq:FB)  at the direction of counsel or in order to participate in any private action arising under the Private Securities Litigation Reform Act (the "PSLRA").

3.   I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.   My transactions in the security that is the subject of this litigation during the class period set forth in the complaint are as follows:

| Security (Common Stock, Call, Put, Bonds) | Transaction (Purchase) | Quantity | Trade Date | Price Paid |
|---|---|---|---|---|
| Common | Purchase | 10 shares | May 18, 2012 | $40.03 |
|  |  |  |  |  |
|  |  |  |  |  |

| Security (Common Stock, Call, Put, Bonds) | Transaction (Sale) | Quantity | Trade Date | Proceeds |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

5.   I have not served as or sought to serve as a representative party on behalf of a class during the last three years, except as stated herein:

6.   I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court or any award to me by the Court of reasonable costs and expenses (including lost wages) directly relating to my representation of the class.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:   5 - 23 - 2012          Signed: _Alexis   Alexander_

Print Name: _Alexis   Alexander_

### CERTIFICATION OF LEAD PLAINTIFF
### PURSUANT TO FEDERAL SECURITIES LAWS

I Robert D. Herpst,  declares as follows:

1.    I have reviewed a copy of the complaint filed in this action.

2.    I did not purchase the security that is the subject of this action Facebook, Inc. (Nasdaq:FB)  at the direction of counsel or in order to participate in any private action arising under the Private Securities Litigation Reform Act (the "PSLRA").

3.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.    My transactions in the security that is the subject of this litigation during the class period set forth in the complaint are as follows:

| Security (Common Stock, Call, Put, Bonds) | Transaction (Purchase) | Quantity | Trade Date | Price Paid |
|---|---|---|---|---|
| Common | Purchase | 400 shares | May 18, 2012 | $ 16,260.95 |
|  |  |  |  |  |
|  |  |  |  |  |

| Security (Common Stock, Call, Put, Bonds) | Transaction (Sale) | Quantity | Trade Date | Proceeds |
|---|---|---|---|---|
| Common | Sold | 400 shares | May 21, 2012 | $ 13,826.74 |
|  |  |  |  |  |
|  |  |  |  |  |

5.    I have not served as or sought to serve as a representative party on behalf of a class during the last three years, except as stated herein: Blank v. Jacobs Case No. 03-2111 (EDNY)

6.    I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court or any award to me by the Court of reasonable costs and expenses (including lost wages) directly relating to my representation of the class.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 23, 2012            Signed:_____

Print Name: _____ROBERT  D.  HERPST___